# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-25-00423-CV

---

**Joshua Bridges, Appellant**

**v.**

**Ashley Mueller and Jeff Mueller, Appellees**

---

### FROM THE 480TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 24-021-A480, THE HONORABLE TERENCE M. DAVIS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Joshua Bridges, proceeding *pro se*, appeals the trial court's Order of Termination, rendered after a bench trial, which terminated his parental rights to N.J.B. (Son). In three appellate issues, Bridges contends that the trial court abused its discretion by denying his motion for a continuance so that he could obtain counsel and that the evidence was legally and factually insufficient to support findings against him under statutory predicate grounds Paragraphs (C), (E), and (F), and the best-interest ground, of Family Code section 161.001(b).[1] We affirm.

---

[1] In spots in his appellate briefing, Bridges identifies the statutory predicate grounds on which findings were made against him as Paragraphs *(A)*, (E), and (F), but the trial court's Order of Termination is clear that the predicate grounds on which the court ordered termination were Paragraphs (C), (E), and (F). Because the arguments that Bridges makes in his briefing fairly encompass an evidence-sufficiency challenge to the finding made against him under Paragraph (C), we construe his briefing as having adequately briefed an evidence-sufficiency challenge to the Paragraph (C) finding.

## BACKGROUND

Son at the time of trial was three months short of his 13th birthday. He was born in September 2012, at a time when Mueller (who then had the surname "Peery")[2] and Bridges were in an on-again-off-again relationship. The two ultimately separated in 2015. In 2017, Mueller and Bridges were party to a suit affecting the parent–child relationship (SAPCR) concerning Son, and in March 2017, the trial court rendered its final order. The court, among other things, ordered that Mueller be Son's sole managing conservator, that Bridges have supervised visitation, and that Bridges pay Mueller monthly child support.

During 2017 and 2018, Bridges lived in many places, often staying in rooms offered by family or friends around the country. He would exercise custody over Son from time to time and would visit with Son as well. But December 2018 was the last time that Bridges would visit with Son for over five years. In March 2019, Bridges began living in Colorado on a consistent basis. But from 2019 through about 2023 or 2024, he had bouts of difficulty holding down a steady job and making ends meet.

Mueller felt frustration with Bridges, believing among other things that he had not made enough effort to involve himself in Son's life. Ultimately, in February 2023, she and her now-husband, Jeff, filed this suit to terminate Bridges's parental rights to Son.[3] The suit was tried to the bench in June 2024. On the day of trial just before it began, the court heard and denied a

---

[2] "Mueller" is appellee Ashley Mueller's present, married name. We use that surname for her throughout for ease of reference.

[3] Jeff Mueller was a co-petitioner in the suit below because he and Ashley Mueller sought an order of adoption for Jeff to be Son's adoptive father. However, the trial court did not grant that relief in its final judgment, the final judgment recites that all relief not granted in it was denied, and no one in this appeal challenges any ruling relating to the denied adoption relief.

2

motion for a continuance that Bridges had filed two days earlier. In the trial itself, Mueller and Bridges were the only witnesses called to testify, and only Mueller offered any exhibits as evidence. The trial court had appointed an amicus attorney to help it protect Son's best interest, and the amicus attorney at trial offered her recommendation that Bridges's parental rights be terminated. After trial, the court rendered its final judgment terminating his parental rights to Son, making findings against him by clear and convincing evidence under Paragraphs (C), (E), and (F) of Family Code section 161.001 and under the statute's best-interest ground. Bridges now appeals.

**DISCUSSION**

We consider Bridges's evidence-sufficiency issues first because they could afford him the greatest relief. *See B.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-24-00661-CV, 2025 WL 1084907, at \*7 (Tex. App.—Austin Apr. 11, 2025, no pet.) (mem. op.).

***The evidence was legally and factually sufficient to support findings against Bridges under the Paragraph (E) statutory predicate ground and under the best-interest ground.***

In his second and third appellate issues, Bridges challenges the legal and factual sufficiency of the evidence supporting the findings made against him under the two elements of termination of parental rights—the statutory predicate ground and the best-interest ground. To terminate parental rights, the petitioner must prove both one of the statutory predicate grounds and that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Each element must be proven by clear and convincing evidence. *See* Tex. Fam. Code § 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

3

Legal-sufficiency review of the evidence to support termination requires reviewing all the evidence in the light most favorable to the finding under attack, and considering undisputed contrary evidence, to decide whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *See In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* When reviewing the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

The trial court made findings against Bridges under statutory predicate grounds Paragraphs (C), (E), and (F). "To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam). But because of the collateral consequences of a Paragraph (D) or (E) finding and the dictates of due process, when on appeal a parent has presented the issue, "an appellate court that denies review of a [Paragraph] (D) or (E) finding deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children." *Id.* at 235. Here, therefore, we review the legal and factual sufficiency of the evidence to support the Paragraph (E) finding against Bridges.

4

Paragraph (E) applies when a parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). For these purposes, "'[e]ndanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Although "endanger" means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury," *id.* (quoting *Boyd*, 727 S.W.2d at 533), or even that the conduct happen in the child's presence, *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at *4 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). *See also A.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-23-00658-CV, 2024 WL 1587046, at *5 (Tex. App.—Austin Apr. 12, 2024, no pet.) (mem. op.) ("Father's illegal-drug use and repeated conduct leading to incarceration still exposed Child to jeopardy and loss even if Father did not do those things while around Child."). "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone," and courts may look to conduct "before the child's birth and both before and after the child has been removed" from the parent's custody. *See Pruitt*, 2010 WL 5463861, at *4. "A factfinder may infer endangerment from 'a course of conduct' that presents substantial risks to the child's physical or emotional well-being," and "[t]hose risks can be developed by circumstances arising from and surrounding a parent's behavior." *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024). A factfinder may infer that past conduct endangering a child's well-being may recur if the child is returned to the parent. *L.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-25-00257-CV, 2025 WL 1829912, at *7 (Tex. App.—Austin July 3, 2025, no pet.) (mem. op.). "Conduct that

subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Pruitt*, 2010 WL 5463861, at *4.

Important under Paragraph (E) is whether the endangerment of the child's well-being was the direct result of a person's conduct, including acts, omissions, or failures to act. *See T.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00174-CV, 2021 WL 4692471, at *6 (Tex. App.—Austin Oct. 8, 2021, pet. denied) (mem. op.); *In re J.F.-G.*, 612 S.W.3d 373, 382 (Tex. App.—Waco 2020), *aff'd*, 627 S.W.3d 304 (Tex. 2021). "Termination under subsection (E) requires more than a single act or omission"—the petitioner must show "a voluntary, deliberate, and conscious course of conduct by the parent, considering a parent's actions both before and after the child was removed from the home." *T.M.*, 2021 WL 4692471, at *6.

We first address two matters that run throughout Bridges's appellate briefing. First, in some of his arguments, he criticizes Mueller's testimony by contrasting it with what, he argues, "[t]he evidence shows." These arguments appear to misunderstand that Mueller's testimony at trial *is itself evidence*. *See Gonzales v. Gonzales*, 704 S.W.3d 54, 66 n.3 (Tex. App.—Austin 2024, no pet.). We will review Mueller's testimony under the rules governing legal- and factual-sufficiency review just as any other testimony is reviewed under those rules. Second, some of Bridges's arguments, especially under the best-interest ground, refer to matters for which there is no evidence in the trial record. To the extent that Bridges relies on matters that are not shown in the evidence from trial, we decline to address those matters, which are his references to statements made by the amicus attorney outside of trial; references to his older son's improvements in academic performance, behavior, and well-being; and references to reports from the older son's school's personnel and from what Bridges calls "community witnesses."

6

Relevant under the evidence here, endangering conduct includes criminal conduct by the parent, which can subject the child to uncertainty, especially given the potential consequence of incarceration. *See A.L.-E. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-24-00499-CV, 2025 WL 43936, at *3 (Tex. App.—Austin Jan. 8, 2025, no pet.) (mem. op.); *In re B.J.F.*, No. 01-23-00522-CV, 2024 WL 117174, at *25 (Tex. App.—Houston [1st Dist.] Jan. 11, 2024, pet. denied) (mem. op.). The evidence here showed this kind of conduct by Bridges. He admitted to "significant criminal history," and Mueller described him as having "a longstanding criminal history." She provided evidence that he has been arrested for aggravated stalking, criminal trespass, battery, criminal mischief, interfering with an emergency call, family-violence assault causing bodily injury, unlawfully carrying a firearm, evading arrest with a vehicle, and tampering with physical evidence. Bridges admitted the instance of evading arrest, and both he and Mueller described an episode that involved his throwing a firearm from his vehicle so that the police would not find him with it.

Also constituting evidence of endangerment are instances of committing domestic violence and of a lack of self-control and instances showing a propensity for violence. *Isam v. Isam*, No. 03-23-00299-CV, 2025 WL 1196004, at *6 (Tex. App.—Austin Apr. 25, 2025, no pet.) (mem. op.). Mueller testified that Bridges had been physically violent with her when the two were together and had been arrested for it at least once. Bridges admitted that he had been arrested for domestic violence and that he had been physically violent with her. She also testified that the physical violence had happened so often that she could not count the number of times that it had happened. Even after the 2017 final order in the parties' SAPCR proceeding, she testified, Bridges in one instance tackled her to the floor and broke her phone when she tried to call the police.

Given the instances of domestic violence and other criminal conduct, Bridges admitted that he has engaged in endangering behaviors:

> Q. The behaviors you've engaged in, do you think those would endanger your child's emotional or physical well-being if he would have been with you?
>
> A. If he would have been with me?
>
> Q. Yes.
>
> A. I don't believe I would have engaged in those behaviors.
>
> Q. That's not the question.
>
> A. Yes, I—yes, in the past.
>
> Q. And what were those behaviors that you think you've engaged in in the past that you believe would have endangered your child's well-being that you acknowledge? What are those?
>
> A. Acting aggressively, yelling in the past.
>
> Q. Being physically—assaulting people, have you done that? Would that be one of the behaviors?
>
> A. I've gotten—I've gotten physical, yes, Your Honor.
>
> Q. Okay. Throwing a gun onto the ground where someone could find it, is that a dangerous behavior?
>
> A. Yes, Your Honor, but—
>
> Q. Fleeing the police, is that a dangerous behavior?
>
> A. And I knew that would haunt me. Yes, Your Honor.

This constitutes evidence of Paragraph (E) endangerment. *See Isam*, 2025 WL 1196004, at *6.

And finally, a parent's significant lack of contact with the child and absence from the child's life endangers the child's emotional well-being. *See S.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00123-CV, 2022 WL 2500337, at *6 (Tex. App.—Austin July 7,

2022, no pet.) (mem. op.); *In re A.J.D.*, No. 02-13-00183-CV, 2013 WL 5781478, at *4 (Tex. App.—Fort Worth Oct. 24, 2013, no pet.) (mem. op.). The testimony here showed that Bridges went long periods without seeing Son at all or seeing him only minimally. This included no visits from January 2019 through February 2024—during that period Bridges failed to press for the supervised-visitation rights that the 2017 SAPCR final order gave him. Even before that five-year gap, his efforts at visitation, Mueller testified, were inconsistent and even when attempted, often last-minute. And during the almost two and a half years that this suit was pending, Bridges attended, according to Mueller, only six visits with Son.

Bridges argues in his appellate briefing that as to the Paragraph (E) finding, there was no evidence of any endangering conduct, but there was, as we have laid out above. He also argues that there was no evidence of his committing abuse, neglect, or violence directly against Son, but, as we have said, endangering conduct can exist even if the conduct was not directed at the child and even if the child did not actually suffer injury. *See M.C.*, 917 S.W.2d at 269 (quoting *Boyd*, 727 S.W.2d at 533). His final argument is that he had exhibits to offer as evidence but that he did not offer them "because he was unrepresented and unaware of the procedural requirement to offer them."[4] Our evidence-sufficiency review is limited to the evidence admitted at the trial or otherwise properly made part of the record. *See B.L.M. v. J.H.M.*, No. 03-14-00050-CV, 2014 WL 3562559, at *13 (Tex. App.—Austin July 17, 2014, pet. denied) (mem. op.). Nothing in the record shows any action by Bridges to have the trial court consider these exhibits or to have them entered into the record, so he did not preserve any error based on the exhibits' contents. *See* Tex. R. App. P. 33.1–.2; Tex. R. Evid. 103. He is held to the same procedural standards as are parties

---

[4] Bridges does not point to any contrary evidence in the record when making his arguments under Paragraph (E).

9

represented by counsel, so his reliance on his *pro se* status at trial is unavailing. *See Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 184–85 (Tex. 1978).

Bridges in his appellate reply brief advances an argument not raised in his opening brief—that there was evidence that since the endangerment-related events described above, he made efforts at treatment and rehabilitation that have resulted in greater stability in his life. All that may be so, but we conclude that this evidence did not prevent the trial court from forming a firm belief or conviction that Bridges had committed conduct sufficient to support the Paragraph (E) finding, especially because crediting his proffered evidence of more recent stability requires crediting his testimony, which the trial court reasonably could have largely discounted. *See A.C.*, 560 S.W.3d at 631 (factual-sufficiency standard); *J.F.-G.*, 627 S.W.3d at 316–17 (considerations when balancing parent's testimony of his or her own recent improvements against other evidence of the parent's past endangering conduct) (citing *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)).

In light of the applicable legal- and factual-sufficiency standards, we conclude that the evidence was sufficient to support a finding against Bridges under Paragraph (E). We need not reach the other portions of his appellate issues that address the Paragraph (C) and (F) findings. *See* Tex. R. App. P. 47.1; *N.G.*, 577 S.W.3d at 232. We overrule the relevant portions of his issues.

Bridges also mounts an evidentiary-sufficiency attack on the best-interest finding. When reviewing best-interest findings, factors that courts consider include (1) the child's wishes, (2) the child's emotional and physical needs now and in the future, (3) emotional or physical danger to the child now and in the future, (4) the parenting abilities of the parties seeking custody, (5) programs available to help those parties, (6) plans for the child by the parties seeking custody, (7) the stability of the proposed placement, (8) the parent's conduct that may indicate that the

existing parent–child relationship is improper, and (9) any excuses for the parent's conduct. *In re J.W.*, 645 S.W.3d 726, 746 (Tex. 2022) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). This list is not exhaustive, not all factors need be proven to establish best interest, and proof of only one factor may in a particular factual context support termination. *See M.L. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00541-CV, 2023 WL 2025710, at *5 (Tex. App.—Austin Feb. 16, 2023, no pet.) (mem. op.); *S.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00039-CV, 2020 WL 3892796, at *16 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.). Evidence probative under the statutory predicate grounds may also be probative of best interest, *A.C.*, 560 S.W.3d at 631–32, particularly evidence showing endangerment, *see C.H.*, 89 S.W.3d at 28; *M.L.* 2023 WL 2025710, at *5.

Under the first, desires-of-the-child factor, the evidence weighed in favor of termination. Mueller testified that during the gap from 2019 to 2024 in Bridges's visits with Son, Son never asked to see Bridges or about why Bridges was not seeing him. After Bridges resumed visiting with Son in 2024, and even after their first visit went well, Son, according to Mueller, did not like the idea that the visits might recur monthly and wanted instead only at most about once a year. Son declined the next, May 2024 visit, even after the visitation facilitator talked with Son about the matter without Mueller nearby. For the June 2024 visit, Bridges brought his older son, who is Son's half-brother, and although Son enjoyed seeing the half-brother, Son still wanted to end the visit after about 15 to 20 minutes because the half-brother, Mueller testified, "was talking to him about various things relating to" Bridges that Son "didn't really understand" but that made Son uncomfortable, including Mueller and Bridges's court case. Son was reluctant to visit with Bridges any further, but even after some cajoling led him to agree to another visit, he asked to leave before an hour had elapsed because he was uncomfortable with how Bridges was asking him

11

to listen to, as Mueller put it, a "talk about how . . . it makes [Bridges] sad whenever [Son] doesn't stay for the visits and things like that." According to her, Son does not refer to Bridges as his father but as "his biological producer" or simply by his first name. For his part, Bridges points to his testimony that his attempts at arranging supervised visits were always rebuffed by Mueller, but the trial court could have disbelieved his testimony and could have given weight to the absence of any attempts to arrange visits shown otherwise in the evidence. We conclude that the evidence under this first *Holley* factor weighed in favor of termination. *See M.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00527-CV, 2021 WL 1045727, at \*9 (Tex. App.—Austin Mar. 19, 2021, no pet.) (mem. op.) (reluctance or refusal to visit with parent); *In re E.G.A.*, Nos. 01-24-00204-CV, 01-24-00206-CV, 2024 WL 3941021, at \*19 (Tex. App.—Houston [1st Dist.] Aug. 27, 2024, pet. denied) (mem. op.) (same).

Under the second, third, fourth, seventh, and eighth factors, we consider significant all the evidence that we recounted above under the endangerment predicate ground. *See A.L.-E.*, 2025 WL 43936, at \*5. And under those same factors plus the sixth, the evidence showed two more matters weighing in favor of termination.

The first is that while Son has significant personal needs, the needs are unlikely to be addressed by Bridges, and their effects may even be worsened by him. Son has suffered from behavioral difficulties beginning at about age four; he has been diagnosed with ADHD and Level 1 autism-spectrum disorder; and he deals with dyslexia, dysgraphia, and dyscalculia. All these have affected his maturation and behavior. He has seen a neurologist and takes medication for the issues. He is no longer in public school but attends both private schooling and regular appointments with professionals who help him with his challenges. Mueller testified that Bridges does not thoroughly understand Son's special needs and has not made the effort to learn about

12

Son's struggles, all of which risks escalating Son's behaviors. And Bridges admitted that in the last five years, he has not talked to any of Son's teachers and has not asked for the names of any professionals who have treated Son. More than once when Son stayed with Bridges in the past, Bridges would not give Son his medication, so Son would "come back and have two or three days to readjust at school." Later, about the time that the supervised visits started, Son's behavioral issues at school happened more often—behaviors like leaving class or the lunchroom when not supposed to and flipping chairs and tables. His behavior analyst has noted the increase in problematic behaviors since Bridges's more recent visits began. Mueller explained that any sort of change in Son's surroundings causes him difficulties, like when one of his school classes once had a substitute teacher, so his having "to go do visits at another place and things like that" would be a problem. Therefore, Bridges's "nomadic lifestyle," as Mueller explained it—he for some years would move residences in quick succession—would, if Son endured it as well, cause Mueller concern. She believed that Son's hypothetical life with Bridges would be lacking "structure and consistency," and she is concerned about whether Bridges knows how to "approach [Son] with his behavior things in an appropriate way that's . . . in line with his autism diagnosis."

Second, and Son's special needs aside, the evidence showed still other potentially destabilizing aspects for Son's life if Bridges's parental rights were not terminated. Mueller testified that she is concerned about Bridges's mental stability because he has discussed committing suicide, being so depressed that he cannot work, and feeling that "everything is caving in" and "that he's unable to deal with things that as an adult he needs to deal with . . . that are important." He also is "volatile," has had hallucinations and paranoid feelings, and has mood swings such that "you just never knew what you were going to get." Bridges admitted struggling with mental-health issues and to a single episode of suicidal ideation, in 2019. During the 2019

13

episode, Bridges sent Mueller a message asking her to tell Son goodbye for him. Also, Bridges's wife, who lives with him, has a history of using methamphetamine, and Bridges acknowledged that she has used before.[5] In a text message to Mueller, he once said of his now-wife, "Who the fuck abandons their kid to do drugs?" According to other text messages from him, he has in the past considered his now-wife to be a liar and cheater. He has said about his life with her in the past: "I was mind[-]fucked in 2019. She started acting differently. She started putting herself above everything else." Then in 2021, again according to Bridges, she was arrested, and she at the time was having sex with a drug dealer and was "having a mental breakdown" and "having hallucinations, paranoia, [and] going cray." She has threatened suicide and for a time went to a mental hospital. In another text message, Bridges offered a summation of some of her past, "She's got a history book thick pile of medical records from sudden psychosis since Sept[.] 2020."

Finally among the evidence under these factors, Bridges acknowledged that the Muellers are good parents and that Son is happy in their home. And Mueller testified that Son has good relationships with her husband and with the Muellers' two-year-old daughter.

Bridges responds to all this evidence by pointing to his testimony about how he is currently more stable in his home and finances and how both he and his wife have sought and

---

[5] The trial court could infer from Bridges's testimony that if his parental rights to Son were not terminated, then Bridges's wife would be around Son from time to time. Bridges testified:

Q. Okay. And, presumptively, this would be an individual that would be around [Son] if you were able to get visitation or time with him. Correct?

A. Medically speaking, not this person.

Elsewhere in his testimony, Bridges indicated that he meant that his wife is no longer the same person as who she was when using methamphetamine because she does not use it anymore and has received treatment.

14

received treatment. While these matters cut in Bridges's favor, overall, the endangerment evidence and other best-interest evidence shows that the trial court could have formed a firm belief or conviction that not terminating Bridges's parental rights would cause Son jeopardy and instability, supporting its best-interest finding. *See M.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-23-00510-CV, 2024 WL 589907, at \*13 (Tex. App.—Austin Feb. 14, 2024, no pet.) (mem. op.) (stating in best-interest review that "stability and permanence are paramount considerations in evaluating the needs of a child"); *accord A.L.-E.*, 2025 WL 43936, at \*5. More particularly, Bridges points to his testimony that he is now financially stable, but that testimony was undercut by Mueller's evidence that he has often neglected to pay his monthly child-support obligation to her, even to the present. Although the obligation began following the March 2017 SAPCR final order, he did not make his first child-support payment to Mueller until August 2019. There were other long gaps of nonpayment, from July 2020 to February 2022, from March 2022 to September 2023, and from November 2023 to March 2025, with this suit being filed in February 2023. Bridges also argues that the evidence at trial was one-sided because he neglected to offer his exhibits as evidence. For the same reasons as laid out above, the lack of Bridges's exhibits in the record is not grounds for reversal.

To sum up under the second, third, fourth, sixth, seventh, and eighth *Holley* factors, the evidence weighed in favor of termination even when accounting for Bridges's testimony.

Under the ninth factor, Bridges offered evidence not so much of excuses for his past behavior but of his assurances that he has improved now and that he and his wife's home would be safe and stable for Son to live in. Even so, and bearing in mind that not all the *Holley* factors need be proven to establish best interest and that proof of only one factor may in a particular factual context support termination, *see M.L.*, 2023 WL 2025710, at \*5; *S.C.*, 2020 WL 3892796,

15

at *16, we conclude that the trial court could have formed a firm belief or conviction that terminating Bridges's parental rights was in Son's best interest and that Bridges's competing testimony was not so significant that the trial court was prevented from forming this firm belief or conviction. We therefore overrule the best-interest portions of Bridges's appellate issues.

### *Bridges, to support a continuance, did not show that his lack of counsel by the time of trial was not due to his own fault or negligence.*

In his first appellate issue, Bridges contends that the trial court abused its discretion by denying his motion for a continuance so he could obtain counsel. He argues on appeal:

> Appellant had previously retained counsel but was forced to terminate representation when he could no longer afford the costs of ongoing litigation, including discovery and deposition expenses. His intent was to retain new counsel once the case reached trial, when representation was most critical. Days before trial, Appellant filed a written motion for continuance seeking additional time to hire counsel.

The trial court heard the motion on the day of trial and denied it.

We review the denial of a continuance for an abuse of discretion. *See S.A.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-24-00664-CV, 2025 WL 567839, at *6 (Tex. App.—Austin Feb. 21, 2025, no pet.) (mem. op.). A motion for a continuance ordinarily must be verified, by affidavit or otherwise. *See id.* at *7 & n.7; *see also* Tex. R. Civ. P. 251. When a motion for continuance does not comply with Rule 251, reviewing courts generally presume that the trial court did not abuse its discretion in denying the motion. *J.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00327-CV, 2022 WL 14656776, at *2 (Tex. App.—Austin Oct. 26, 2022, no pet.) (mem. op.). Plus, "[i]n civil cases in which the absence of counsel has been urged as a ground for continuance, courts generally require a showing that the failure to be represented at trial was not due to the party's own fault or negligence." *Gabra v. Gabra*, No. 01-20-00298-CV,

16

2021 WL 1567750, at *8 (Tex. App.—Houston [1st Dist.] Apr. 22, 2021, no pet.) (mem. op.).

When in a termination case the parent fails to make a required showing to support his or her motion for a continuance, the trial court does not abuse its discretion by denying the motion. *See S.A.D.*, 2025 WL 567839, at *7; *E.T. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-15-00274-CV, 2015 WL 5781248, at *4 (Tex. App.—Austin Sept. 29, 2015, no pet.) (mem. op.).

Bridges was represented by counsel during earlier portions of this suit, but the trial court permitted his counsel to withdraw in November 2024.[6] The case was next set for trial in March 2025, but the trial court granted an agreed continuance and stated in its order granting the continuance that "[n]o further continuances will be granted." Trial was later set for June 2025, and two days before it was set to begin, Bridges moved for a continuance, which was not agreed, without any supporting evidence, such as an affidavit, meaning that his motion did not comply with Rule 251. He explains on appeal, as set forth above, that he waited until shortly before trial to retain new counsel. His trial-court motion does not undermine this assertion. We conclude that his motion did not make the required showing that his lack of counsel by the time of trial was not due to his own fault or negligence—indeed, his representation on appeal suggests that he himself caused the delay in securing new counsel by consciously waiting for the eve of trial. We thus conclude that the trial court did not abuse its discretion by denying his requested continuance. *See Gabra*, 2021 WL 1567750, at *8; *S.A.D.*, 2025 WL 567839, at *6–7; *see also* Tex. R. Civ. P. 253 ("Except as provided elsewhere in these rules, absence of counsel will not be good cause for a continuance or postponement of the cause when called for trial, except it be allowed in the discretion of the court, upon cause shown or upon matters within the knowledge or information of

---

[6] Bridges assigns no error to the trial court's allowing his prior counsel to withdraw.

17

the judge to be stated on the record."). Even though Bridges refers to due process when arguing this continuance issue in his appellate briefing, arguing that the denial of his motion for the continuance amounted to a denial of due process because it meant that he proceeded to trial without counsel, the failure of his motion to make a required showing is fatal to his appellate issue even when considering his references to due process. *See In re J.E.R.A.*, No. 14-23-00851-CV, 2024 WL 1926493, at *4–6 (Tex. App.—Houston [14th Dist.] May 2, 2024, pet. denied) (mem. op.) (concluding that trial court did not abuse its discretion by denying motion for continuance that suffered from "lack of support" in appeal in which appellant couched her continuance issue in terms of deprivation of due process); *In re J.L.W.*, No. 08-09-00295-CV, 2010 WL 5541187, at *4–5 (Tex. App.—El Paso Dec. 29, 2010, no pet.) (concluding that party's Rule 251 "fail[ure] to properly present to the trial court his motion for continuance based upon due process grounds" was fatal to appellate issue concerning deprivation of due process from denial of continuance); *see also In re T.C.*, Nos. 07-18-00080-CV, 07-18-00081-CV, 2018 WL 4039426, at *4 (Tex. App.—Amarillo Aug. 23, 2018, pet. denied) (mem. op.) (concluding that denial of continuance did not deprive parent of due process partly because motion for continuance did not comply with Rule 251); *In re K-A.B.M.*, 551 S.W.3d 275, 283–84 (Tex. App.—El Paso 2018, no pet.) (same); *D—F— v. State*, 525 S.W.2d 933, 941 (Tex. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.) (same). We overrule Bridges's remaining appellate issue.[7]

---

[7] Bridges raises a matter in his appellate reply brief that he did not raise in his opening brief—that the amicus attorney purportedly did not conduct an adequate investigation. To the extent that this is an effort to raise a new issue in his reply brief (rather than simply a new argument in support of the issues raised in his opening brief), we do not reach the issue. *See In re J.Z.A.*, 720 S.W.3d 558, 572 n.4 (Tex. App.—El Paso 2025, pet. filed); *In re S.O.*, No. 02-23-00480-CV, 2024 WL 2066378, at *5 n.13 (Tex. App.—Fort Worth May 9, 2024, no pet.) (mem. op.); *In re S.C.M.*, No. 01-22-00964-CV, 2023 WL 3873342, at *5 (Tex. App.—Houston [1st Dist.] June 8, 2023, pet. denied) (mem. op.). To the extent that this is a new argument raised in support of his

**CONCLUSION**

We affirm the trial court's judgment.

_____

Chari L. Kelly, Justice

Before Justices Triana, Kelly, and Theofanis

Affirmed

Filed: December 12, 2025

---

properly raised appellate issues, the amicus attorney's allegedly inadequate investigation to inform her opposition to Bridges's requested continuance does not change the fact that Bridges failed to make a required showing to support his motion for the continuance and does not undermine our conclusions about the legal and factual sufficiency of the evidence.